UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT CUMBERLAND,                                    :

                              Petitioner,             :        08 Civ. 04389 (LAP) (DF)

    -against-                                         :        **REPORT AND**
                                                               **RECOMMENDATION**
HAROLD D. GRAHAM,                                     :

                              Respondent.             :
------------------------------------------------------------X

**TO THE HONORABLE LORETTA A. PRESKA, U.S.D.J.:**

*Pro se* petitioner Robert Cumberland ("Petitioner") seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, following his state conviction, upon a jury verdict, of two counts

of Rape in the First Degree, in violation of New York State Penal Law § 130.35; three counts of

Sodomy in the First Degree, in violation of New York State Penal Law § 130.50; three counts of

Sexual Abuse in the First Degree,[1] in violation of New York State Penal Law § 130.65; and two

counts of Robbery in the Third Degree, in violation of New York State Penal Law § 160.05.[2]

Petitioner is currently incarcerated at the Green Haven Correctional Facility, in Stormville, New

York.  (*See* Dkt. 20.)

---

[1] Neither party has provided a transcript of the jury verdict or sentencing in this case, and thus the Court must rely on other sources of information about the underlying convictions. Although the Amended Petition indicates that Petitioner was convicted of two counts of sexual abuse (*see* Amended Petition, dated Oct. 27, 2008 ("Am. Pet." or "Amended Petition") (Dkt. 25), § 5), the Appellate Division observed that Petitioner was actually convicted of three counts, *see People v. Cumberland*, 822 N.Y.S.2d 284, 284-85 (1st Dep't 2006) (noting Petitioner's conviction for "two counts of rape in the first degree, three counts of sodomy in the first degree, *three counts of sexual abuse in the first degree*, three counts of kidnapping in the second degree and two counts of robbery in the third degree" (emphasis added)).

[2] Petitioner was also convicted of three counts of Kidnapping in the Second Degree, in violation of New York State Penal Law § 135.20, but those convictions were overturned on appeal, as discussed *infra*.  (*See* Background Section B(3).)

Petitioner asserts that his conviction should be vacated because (1) the trial court conducted the state proceedings in a biased manner (*see* Am. Pet., App'x, at 12-15); (2) the prosecution improperly referenced Petitioner's exercise of his Fourth Amendment rights as evidence of guilt and introduced evidence without sufficient foundation (*id.*, at 16-19); (3) Petitioner's trial counsel rendered ineffective assistance by failing to prepare sufficiently for trial, to cross-examine a key witness effectively, or to object to the prosecution's improper references to Petitioner's exercise of his Fourth Amendment rights (*see id.*, at 20-25); (4) Petitioner's appellate counsel rendered ineffective assistance by failing to raise certain claims on appeal (*see id.*, at 25-27); and (5) certain of Petitioner's indictments violated the New York statute of limitations, as well as the federal statute, which, Petitioner claims, preempts the state limitations period (*id.*, at 27-30).  Respondent Harold D. Graham ("Respondent"), the superintendent of the Auburn Correctional Facility,[3] argues that Petitioner's various claims should be dismissed as procedurally barred or without merit.  For the reasons set forth below, I recommend that the Amended Petition be dismissed.

---

[3] As Petitioner was incarcerated at the Auburn Correctional Facility at the time he commenced this action, he named the superintendent of that facility as Respondent.  (*See* Am. Pet., at 1.)  Petitioner is currently incarcerated at the Green Haven Correctional Facility.

## BACKGROUND

Petitioner was tried for raping three women, in three separate incidents between 1997 and 2002.  Each victim identified Petitioner as the man who had violently raped her, and two also claimed that he had robbed them before or after the rape.

A.    **Factual Background**[4]

1.    **Attack Against M.G.**[5]

On April 1, 1997, at around 2:00 or 3:00 p.m., M.G., then a 36-year-old woman, left her therapist's office in lower Manhattan for a subway station.  (*See* Transcript of trial, conducted on Mar. 2-11, 2004 ("Trial Tr."), at 595:6-597:11, 604-41.)  At or near the station, Petitioner approached M.G., began discussing music with her, and claimed that he was establishing a recording studio in the vicinity.  (*See id.*, at 597:14-598:7.)  After raising the possibility of a secretarial position at the studio, Petitioner invited M.G. to accompany him to his office at a commercial building on John Street for the purported purpose of completing an application form.  (*See id.*, at 598:1-599:24.)

At the building, Petitioner told M.G. that the elevator was malfunctioning so that they would have to go to the floor above the studio and then walk down one flight of stairs to the correct floor.  (*See id.*, at 600:7-24.)  The floor to which they walked, however, was dark and deserted.  (*See id.*, at 601:3-13.)  When M.G. attempted to leave, Petitioner grabbed her from behind, and she felt something like a gun pressed into her back; when she screamed, Petitioner

---

[4] The facts summarized herein are primarily taken from the testimony of the prosecution's witnesses at trial.  To the extent relevant to the Petition, the Court will also note testimony that was disputed or contradicted.

[5] The Court refers to the rape victims by their initials in order to protect their privacy. *See* New York Civil Rights Law § 50-b.

threatened to murder her.  (*See id.*, at 601:14-602:23; 654:1-8.)  Fearing for her life, M.G. complied with Petitioner's demand that she partially undress, after which he sexually assaulted her.  (*See id.*, at 603:10-606:17.)  After the assault, M.G. walked out of the building with Petitioner, and, when they reached the sidewalk, he asked her for a date, which she declined. (*See id.*, at 606:21-608:18.)  During their last exchange, standing on the sidewalk, M.G. studied her rapist's appearance and noticed a scar on his face.  (*Id.*, at 609:13-21.)

After the attack, M.G. saw a police car but decided not to run towards it because she was "terrified" and "in shock."  (*Id.*, at 609:3-16.)  M.G. instead returned to the nearby office of her therapist, and told the therapist about the rape.  (*See id., at* 609:17-610:5.)  The therapist unsuccessfully urged M.G. to go to the hospital, and then contacted M.G.'s mother, who brought M.G. to N.Y.U. Downtown Hospital.  (*See id.*, at 610:6-611:7.)  At the hospital, a doctor examined M.G., took swabs with a rape kit, and contacted police to report the crime.  (*See id.*, at 611:8-612:3; 729:10-730:4.)  M.G. described the perpetrator as an approximately six-foot tall, African-American male with a facial scar, and, after leaving the hospital, she showed police where the crime had occurred.  (*See id.*, at 613:1-22; 614:23-615:16.)  Although M.G., ashamed of having placed herself in a vulnerable position, initially told police that the rapist had forced her into the building, she later admitted that she went inside with him voluntarily.  (*See id., at* 617:1-21; 632:4-634:13.)  Based on M.G.'s description, a police artist prepared a sketch of the perpetrator.  (*See id.*, at 616:7-12.)

During the course of the investigation, M.G. again provided police with a description of her attacker as a black male, 6'1" tall, and 220 pounds, and as having a missing tooth or gap between his teeth as well as a scar above his right eye.  (*See id.*, at 763:18-764:5.)

2.      **Attack Against H.C.S.**

On the morning of December 23, 2001, Yoko Agency, an escort agency in Queens, received a call from a man requesting an escort at 90 Gold Street in lower Manhattan. (*See id.*, at 266:7-270:1.) The man agreed on the phone to pay $200 for sex, and H.C.S., an escort with the agency, went to the location he specified, carrying a piece of paper on which the address was written. (*See id.*, at 268:13-22; 269:20-270:6.)

When H.C.S. arrived at the location, Petitioner was sitting at the building's front desk, as if he were a security guard or other building employee. (*See id.*, at 270:7-271:7.) Petitioner instructed H.C.S. to sign a blank piece of paper, then indicated that he would escort her to her destination. (*See id.*, at 270:7-271:16.) After entering the elevator with H.C.S., Petitioner pulled a knife and pointed it at H.C.S., grabbed her wallet out of her bag, and stole her money. (*See id.*, at 271:18-272:12.) When the elevator arrived at the top floor of the building, H.C.S followed Petitioner off the elevator because he continued to threaten her with the knife. (*See id.*, at 272:17-273:2.) Petitioner then dragged H.C.S. into a stairwell and forcibly raped her while holding the knife. (*See id.*, at 273:3-275:11.) H.C.S. offered Petitioner a condom because she was "afraid of getting AIDS," but he did not use it. (*Id.*, at 275:14-276:12.) After Petitioner fled from the stairwell, H.C.S. used the paper with the address to wipe the rapist's semen from her vaginal area. (*See id.*, at 278:3-279:6; 280:25-281:12.)

After H.C.S. left the stairwell, she encountered Mark Goldsmith, a resident of the building.[6] (*See id.*, at 501:15-502:5.) Goldsmith observed H.C.S. looking "very shooken up,

---

[6] Approximately five minutes earlier, Goldsmith had seen a black man whom he did not recognize waiting for the elevator. (Trial Tr., at 501:15-23.) Goldsmith later identified that man as "probably" being Petitioner. (*Id.*, at 502:16-24.)

5

very scared, [and] somewhat in pain," and offered to call security.  (*Id.*, at 502:1-5; 505:5-6.)
H.C.S. asked if the security guard was black, and she left the hallway when Goldsmith went into
his apartment for a minute.  (*See id.*, at 505:5-11.)  Another resident of the same floor, Karl
Markel, encountered H.C.S. around the same time when she "came running up" to him as he was
getting in the elevator, and she accompanied him down.  (*Id.* 512:2-19.)  During the elevator
ride, H.C.S. was leaning against the side of the elevator and moaning, and, when Markel asked if
anything was wrong, she told him that she had been raped.  (*Id.*)  Markel took her to the
management office to report the incident.  (*See id.*, at 513:4-5.)

       After police officers arrived, H.C.S. showed them the paper with which she wiped
herself, the stairwell where the assault occurred, and the paper where she had signed in.  (*See id.*,
at 281:19-282:7.)  After taking H.C.S. to the hospital, where she received a medical examination
(*see id.*, at 284:6-285:6), the police questioned her at the Fifth Precinct, where she described her
attacker as an African-American male, about six feet tall, with a "a gap [in his teeth] or a missing
tooth" (*id.*, at 761:4-25).  Police then retrieved security-camera footage from the elevator that
showed Petitioner taking H.C.S.'s bag while holding a small object in his hand.  (*See id.*, at
1034:8-24.)

                      **3.      Attack Against P.E.**

       On February 21, 2002, P.E., then a 35-year-old woman, went to a music school in a
building located at 17 West 60th Street, in Manhattan.  (*See id.*, at 72:20-73:18.)  After entering
the building, P.E. entered the elevator and pressed the button for the seventh floor, but the
elevator passed the seventh floor and instead opened on the ninth floor, which was "dark."  (*Id.*,
at 75:2-76:7.)  Before P.E. could press the door-close button, a man grabbed her by the hair and
pulled her out of the elevator.  (*See id.*, at 76:6-9.)  The man threatened to kill P.E., and the two

                                          6

engaged in a struggle, during which he broke her cellular phone when she tried to use it to call for help.  (*See id.*, at 76:9-18.)  Holding a knife or blade to P.E.'s neck, the man took P.E. down a hallway to a room, where the two continued to struggle violently.  (*See id.*, at 76:19-77:78:21.)  The man then raped P.E., ejaculating on the floor.  (*See id.*, at 86:3-87:10.)  During the rape, the man stole P.E.'s jewelry, and afterwards stole approximately $1600 in cash (*see id.*, at 79:1-7; 88:8-90:4; 177:22-178:9), instructed P.E. to wait for 20 minutes, and left the room (*see id.*, at 79:10-13).

Immediately after the man left, P.E. ran from the room, took the elevator to the first floor, where she acted "completely hysterical" and yelled for the police, and the security guard called the police.  (*See id.*, at 79:10-80:12, 90:5-22.)  After the police arrived, P.E. showed an officer where the assault had occurred and was eventually taken to Roosevelt Hospital, where she received a medical examination.  (*See id.*, at 93:10-96:5.)  A doctor photographed P.E.'s injuries, which included a bite mark on her back, bruises, and abrasions.  (*See id.*, at 96:8-99:23.)  Although it was mostly dark in the room where she had fought with her attacker, P.E. described her attacker as having "a chipped tooth" at the front of his mouth.  (*See id.*, at 83:8-84:6.)

### 4.   <u>Investigation and Arrest of Petitioner</u>

In March and April of 2002, forensic comparison of the genetic material recovered from the premises and victims of the three reported assaults showed that all three assaults hade been committed by a single perpetrator.  (*See id.*, 762:6-25; 854:21-855:22.)  On May 22, 2002, police arrested Petitioner, who had a prior conviction for a sex offense, for violating sex-offender registration requirements.  (*See* Declaration of Alyson J. Gill, Esq., in Opposition to Petition for

a Writ of Habeas Corpus,[7] dated Jan. 26, 2009 ("Gill Decl.") (Dkt. 14), Ex. B. ¶ 15.)  During a search subsequent to Petitioner's arrest, an officer recovered several items that could potentially contain Petitioner's DNA, including a nylon cap and a piece of bandage with a bloody fingernail fragment.  (*See* Trial Tr., at 811:5-812:6.)  On the day of the arrest, P.E. identified Petitioner in a line up of five men.  (*See id.*, at 115:4-117:5; 779:20-780:24.)  In a different line up the next day, M.G. also identified Petitioner as her attacker.  (*See id.*, at 626:2-627:21, 780:25-782:11.)

While in custody, Petitioner declined a request by a detective to submit to a DNA test. (*See id.*, at 800:21-801:2.)  The same detective subsequently provided Petitioner with a sandwich, soda, coffee, and cigarettes, hoping that Petitioner would leave DNA traces on these items, but Petitioner destroyed or attempted to conceal those items or parts of items that might contain his DNA.  (*See id.*, at 768:11-770:23; 789:18-791:10; 801:8-807:10.)  Police sent what they could recover, along with the items recovered in the search when Petitioner was arrested, for DNA analysis.  (*See id.*, at 772:5-777:25, 856:4-9.)  Eventually, law enforcement also obtained a court order requiring Petitioner to submit to oral swabs.  (*See id.*, 814:8-815:10.)

Ultimately, forensic investigators were able to obtain a DNA profile from the court-ordered swabs, as well as the band aid, fingernail, and nylon cap, and matched Petitioner's DNA with DNA from the crime scenes.  (*See id.*, at 859:14-860:18.)  In particular, investigators found Petitioner's DNA contained in semen on a vaginal swab from M.G.'s rape kit (*see id.*, at 854:8-855:22); a vaginal swab of H.C.S., H.C.S.'s underwear, and the piece of paper H.C.S. used to wipe away her attacker's semen (*see id.*, at 849:4-851:17); and pieces of carpet from the room

---

[7] Although this declaration, and the accompanying memorandum of law, are styled as responses to the "Petition," they address the arguments in Petitioner's Amended Petition as well.

where P.E. was sexually assaulted (*see id.*, at 837:21-838:5); and in saliva on a shirt worn by P.E. (*see id.*, at 841:15-842:25; 846:5-20).

Investigators also obtained a court order allowing them to take photographs and mold impressions of Petitioner's teeth.  (*See id.*, at 817:15-818:18.)  After comparing the photographs and molds with photographs of the bite marks on P.E.'s back, a forensic dentist concluded, to a reasonable degree of scientific certainty, that Petitioner had inflicted the bite on P.E. while standing behind her.  (*See id.*, at 573:21-574:15, 578:18-579:2.)

On May 26, 2002, police executed a search warrant at Petitioner's brother's apartment (*see id.*, at 1047:1-7), where Petitioner had been residing part time (*see id.*, at 1026:1-14).  As part of this search, police searched a closet in the apartment, which the brother identified as containing Petitioner's belongings, and recovered a knife among those belongings.  (*See id.*, at 1047:8-1048:3.)  The knife was never subjected to DNA testing or fingerprinting.  (*See id.*, at 1049:9-13.)

**B.**     **Procedural History**

**1.**     **Trial**

Petitioner was first placed on trial in November, 2003, but that trial ended in a mistrial. (*See* Gill Decl., Ex. R, at 3.)  Petitioner was re-tried in late February and early March of 2004. (See Trial Tr., at 1.)  At the re-trial, the prosecution called to the stand M.G., H.C.S., and P.E., all of whom testified that Petitioner had assaulted and raped them.  (*See generally* Trial Tr., at 600-09 (testimony of M.G.); *id.*, at 270-79 (testimony of H.C.S.); *id.*, at 75-79 (testimony of P.E.).)  The prosecution also introduced DNA and other forensic evidence linking all three attacks to Petitioner.  (*See, e.g.*, *id.*, at 819-867 (testimony of DNA expert); 553-586 (testimony of forensic dentist).)  Petitioner testified on his own behalf, and, while he admitted having sex

9

with each woman, he denied that he had sexually assaulted them, instead contending that he had merely "tricked" them into having sex with him by promising them money and then either not paying them or stealing back his payment.  (*See* citations *infra*, at (c).)

### a.   <u>DNA Evidence</u>

At trial, the prosecution offered the expert testimony of Meredith Rosenberg ("Rosenberg"), a criminalist at the Office of the Chief Medical Examiner in New York City (the "Office"), who had conducted "thousands" of DNA tests.  (Trial Tr., at 819:22-822:12.) According to Rosenberg, the Office received from law enforcement materials related to the three sexual assaults (*see id.*, at 835:3-837:4 (materials from the P.E. assault); *id., at* 849:4-850:7 (materials from the H.S.C. assault); *id.*, at 854:20-855:22 (materials from the M.G. assault)[8]) and determined that the same male donor had left DNA at all three crime scenes (*see id.*, at 854:20-855:22).  The Office then tested oral swabs from Petitioner, items seized at his arrest, and certain items with which he had physical contact during police questioning.  (*See id.*, at 855:23-856:9.) According to Rosenberg, the Office obtained Petitioner's DNA profile through these tests and found that his DNA matched that found at all three assaults.  (*See id.*, at 865:20-866:4.)

### b.   <u>Knife Recovered Among Petitioner's Supposed Possessions</u>

As noted above, both H.C.S. and P.E. testified that Petitioner assaulted them with a knife. (*See id.*, at 76:19-24 (testimony of P.E.), 271:22-275:11 (testimony of H.C.S.).)  At trial, the prosecution, over the objections of defense counsel, questioned Petitioner about a knife that police recovered from a closet in the apartment of Petitioner's brother.  (*See id.*, at 1027:3-1034:15.)  Petitioner testified that, at the time of his arrest, he alternated between living at his

---

[8] The Office contracted an outside company to conduct testing on M.G.'s materials.  (*See* Trial Tr., at 835:12-16.)

brother's home and mother's home, storing personal belongings at both locations (*see id.*, at 1025:25-1027:2), and that the closet where the knife was found was the only closet in his brother's home and consequently held objects belonging to both Petitioner and his brother (*see id.*, at 1027:10-14). Petitioner denied owning any knife that might have been found in the closet, at which point the prosecution marked the knife for identification and showed it to Petitioner, over defense counsel's objections. (*See id.*, at 1030:2-31:2.) Upon seeing the knife, Petitioner denied that it belonged him and said that it resembled his brother's knife. (*See id.*, at 1031:3-1033:16.) Petitioner further denied that he had attacked P.E. or H.C.S. with this or any knife. (*See id.*, at 1033:22-1034:24.)

After concluding Petitioner's cross-examination, the prosecution moved for the admission of "rebuttal" testimony by Detective Edwin Rivera ("Rivera"), who had searched the brother's apartment and found the knife. (*See id.*, at 1038:23-1039:5.) Defense counsel objected that Rivera's testimony was improper as rebuttal and should have been introduced on the prosecution's direct case, but the trial court permitted Rivera's testimony. (*See id.*, at 1039:6-1040:22.) Rivera testified that, pursuant to a search warrant, he had recovered the knife among Petitioner's personal belongings (as identified by Petitioner's brother) in a closet at the brother's home. (*See id.*, at 1047:1-1048:15.)

### c.   **Defense Case**

In his defense, Petitioner claimed that all three victims willingly had sex with him, after he had "tricked" them by promising them money. Regarding M.G., Petitioner claimed that she had approached him at a subway station and suggested exchanging sex for money. (*See id.*, at 950:4-951:17.) According to Petitioner, he promised M.G. 20 dollars, but, after they had sex, refused to pay her, causing her to become very angry. (*See id.*, at 951:18-24; 952:8-24.)

11

Petitioner further testified that he had, at several times, called escort agencies and attempted have sex with escorts without paying.  (*See id.*, at 965:3-967:9.)  Petitioner testified that, in one of those instances, he had called H.C.S.'s agency and arranged for her to meet him at a building in lower Manhattan on the understanding that he would purchase sex from H.C.S. (*See id.*, at 983:14-985:9.)  When H.C.S. arrived, according to Petitioner, he posed as a security guard, instructed her to sign in, and informed her that he would escort her up to the apartment, where she would meet her client.  (*See id.*, at 953:4-17.)  As they rode the elevator, Petitioner told H.C.S. that she was under arrest for prostitution and grabbed her bag.  (*See id.*, at 953:18-956:4.)  According to Petitioner, H.C.S. agreed to have sex with Petitioner in order to prevent the "arrest."  (*See id.*, at 956:5-11.)

Similarly, P.E., according to Petitioner, also met him through an escort agency, with the intention of selling him sex at the building housing the music school.  (*See id.*, at 946:23-947:13.)  Petitioner testified that the two entered a stairwell of the building, where Petitioner gave P.E. money, and then proceeded to an abandoned floor, where they had sexual intercourse. (*See id.*, at 947:13-948:11.)  According to Petitioner, when he attempted to take his money back from P.E.'s bag, a struggle ensued in which P.E. bit his thumb and Petitioner reacted by biting P.E. on her back, before stealing her cellular phone and jewelry.  (*See id.*, at 948:12-950:3.)

### d.    Verdict and Sentencing

Ultimately, a jury convicted Petitioner of 14 felonies.  For the attack on M.G., Petitioner was convicted of one count of first-degree rape, two counts of first-degree sodomy, one count of second-degree kidnapping, and one count of first-degree sexual abuse.  (*See* Gill Decl., Ex. O, at 2.)  For the attack on H.C.S., Petitioner was convicted of one count each of first-degree rape, first-degree sodomy, second-degree kidnapping, and third-degree robbery, as well as two counts

of first-degree sexual abuse.[9]  (*Id.*)  For the attack on P.E., Petitioner was convicted of one count

each of second-degree kidnapping, third-degree robbery, and second-degree assault, but was not

convicted any sex crimes.  (*Id.*; *see also* Memorandum of Law in Opposition to the Petition

for a Writ of Habeas Corpus, dated January 26, 2009 ("Resp. Mem.") (Dkt. 14), at 20; Am. Pet.,

§ 5.)  The trial judge later dismissed the assault count with regard to P.E. because Petitioner

could not have violated New York Penal Law § 120.05, which criminalizes assaults committed

in the course of certain felonies, if, as the jury found, he was not guilty of the underlying felonies

themselves.  (*See* Gill Decl., Ex. H, at 56 & n.39.)

        Based on the account provided by Respondent, "Petitioner was sentenced to eight

indeterminate 25-year prison terms for the rape, sodomy, and kidnapping counts, three

determinate seven-year prison terms for the sexual abuse charges, and two indeterminate prison

terms of from two and one-third to seven years for robbery charges."  (Resp. Mem., at 20.)

According to Respondent, the sentencing court imposed all the sentences consecutively, with the

exception of the sentences for the two kidnapping convictions, which were imposed

concurrently, resulting in a total sentence of from 175 and two thirds to 185 years for these

convictions.[10]  (*See id.*)

----

        [9] Although Petitioner was charged with first-degree robbery (an element of which is the
use of a weapon) for allegedly robbing H.C.S. at knifepoint in the elevator, he was convicted
only of the lesser offense of third-degree robbery.  (*See* Gill Decl., Ex. H, at 56.)

        [10] Petitioner describes his sentence as "185 years, (reduced to fifty years pursuant to
law)" (Am. Pet., § 4), perhaps referring to N.Y. Penal L. § 70.30, which introduces a statutory
maximum sentence of 50 years in certain cases.  This Court's independent search for Petitioner's
name using the "inmate information" search function on the Department of Corrections and
Community Supervision website did yield an entry listing Petitioner's aggregate maximum
sentence as 50 years.  *See* http://nysdoccslookup.doccs.ny.gov/.

## 2.      First Section 440 Motion To Vacate Judgment

On April 16, 2005, Petitioner moved to vacate the verdict against him pursuant to Section 440 of New York Criminal Procedure Law.  (*See* Gill Decl., Ex. A (Memorandum of Law [in Support of Section 440.10 Motion], dated Apr. 16, 2005).)  According to Petitioner's motion, his rights under the Fourth, Sixth, and 14th Amendments to the United States Constitution were violated at multiple points, including:  (1) when the police took his DNA without a court order, (2) when the prosecutor "redisclosed" the DNA results to the jury, (3) when the trial court refused to issue its own subpoenas to certain police witnesses whom the defense wished to call, (4) when the prosecution played an audio recording of a 911 call in the presence of the jury, (5) when the prosecutor made certain statements to the jury, including statements casting aspersions on Petitioner for allegedly hiding his DNA, (6) when the prosecution introduced the knife, and (7) when the trial court denied defense counsel's request to question police witnesses about certain records.  (*See id.*, at 1-3.)  Finding that the grounds for each portion of the motion were included in the trial record (and thus capable of being raised on direct appeal), the trial court summarily denied the motion on July 19, 2005.  (*See* Gill Decl., Ex. C.)  Petitioner's request for leave to appeal this decision (*see id.*, Ex. D) was denied on November 10, 2005 (*see id.*, Ex. E).

## 3.      Direct Appeal

In a counseled brief dated October 2005, Petitioner argued, on direct appeal to the Appellate Division, First Department:  (1) that the trial court conducted the criminal proceedings in a biased manner, denigrating defense counsel in front of the jury and holding the two sides to different standards, and that this treatment violated Petitioner's due-process rights (*see id.*, Ex. F (Brief for Defendant-Appellant, dated Oct. 2005, at 37-54); (2) that the trial court erred in admitting the knife because no foundation had been laid, and erred in permitting the prosecutor

to ask questions about the knife that incorporated hearsay and matters not in evidence (*see id.*, at 55-61); and (3) that Petitioner's kidnapping convictions should be dismissed under the merger doctrine (*see id.*, at 62-67).

After the trial court denied Petitioner's first Section 440 motion because its claims were capable of being raised on direct appeal, Petitioner filed a *pro se* supplemental appellate brief, dated February 18, 2006, raising many of the additional arguments that he had tried to raise on his prior Section 440 motion.  (*See generally* Gill Decl., Ex. G (Supplemental Appellate Brief for Defendant-Appellant, dated Feb. 18, 2006).)  Specifically, Petitioner argued:  (a) that the police violated his constitutional rights by obtaining DNA evidence without his consent and without a court order (*see id.*, at 21-27); (b) that the prosecution's use of Petitioner's DNA test results at trial violated Petitioner's 14th Amendment rights (*see id.*, at 27-33); (c) that the trial court denied Petitioner's constitutional right to a present a defense by preventing him from calling witnesses and presenting evidence (*see id.*, at 33-38); and (d) that the prosecution made improper and prejudicial statements, including improperly referencing Petitioner's exercise of his constitutional rights, and the prosecutor improperly introduced the knife and related evidence (*see id.*, at 38-42).

In its opposition, Respondent conceded that "the kidnapping counts as to all three victims must be dismissed, since they merge with the underlying crimes."  (Gill Decl., Ex. H, at 60.)  As to Petitioner's remaining arguments, Respondent argued:  (1) that "the trial court's conduct was entirely consistent with [Petitioner's] right to a fair trial" (*id.*, at 85-100); (2) that it was proper for the prosecution to introduce the knife, and, in any event, Petitioner was not prejudiced by any prosecutorial misconduct in this regard because jury did not convict him of any of the charges that specified that he had used a knife (*id.*, at 71-84); (3) that Petitioner's guilt was proven

15

beyond a reasonable doubt (*see id.*, at 60-71); and (4) that Petitioner's *pro se* complaints, as contained in his supplemental brief, were "unpreserved and meritless" (*see id.*, at 100-111).

In a *pro se* reply, Petitioner argued:  (a) that Respondent's arguments did not justify or excuse introduction of evidence related to the knife (*see* Gill Decl., Ex. I, at 4-6); (b) that the use of DNA evidence and of statements by the prosecution suggesting that Petitioner had avoided leaving DNA on items given to him by police, violated his rights under the Fourth and Fourteenth Amendments (*see id.*, at 6-8); and (c) that the trial court had implicitly found his *pro se* claims to be preserved when it denied his first Section 440 motion on the grounds that the issues raised were already contained in the record (*see id.*, at 2-3).

On October 19, 2006, the Appellate Division dismissed the kidnapping convictions, finding, as Respondent conceded, that "all three kidnapping charges merged with the underlying crimes." *People v. Cumberland*, 822 N.Y.S.2d 284, 284 (1st Dep't 2006).  In all other respects, however, the Appellate Division affirmed the verdict, finding that "[t]he [trial] court's conduct did not deprive [Petitioner] of a fair trial" and that, "[w]hile, in cross-examination of [Petitioner] about a knife found among his effects in his brother's apartment, the [prosecution] should not have asked questions that assumed facts not yet in evidence, . . . the error [did] not warrant reversal in view of the court's instructions and the overwhelming evidence of [Petitioner's] guilt." *Id.*  The court "rejected [Petitioner's] remaining arguments concerning the knife" and further rejected the arguments in Petitioner's *pro se* supplemental brief as "unpreserved."  *Id.* Although the Appellate Division declined to review those unpreserved claims, it noted that "[w]ere [it] to review these claims, [it] would reject them."  *Id.*

Petitioner subsequently submitted a *pro se* letter seeking leave to appeal to New York Court of Appeals (*see* Gill Decl., Ex. K (Leave Application, dated Dec. 20, 2006)), raising issues

16

regarding "[t]he [k]nife" (*id.*, at 3-5); the "[i]mproper acquisition of DNA" (*id.*, at 5-6); the prosecution's "prejudicial comments" (*id.*, at 6-7); and the trial court's "decision not to assist defense attorney with a subpoena" and related exclusion of certain police reports (*id.*, at 7-9). On February 1, 2007, the Court of Appeals summarily denied leave to appeal. *People v. Cumberland*, 8 N.Y.3d 879 (2007).

### 4.     Second Section 440 Motion To Vacate Judgment

By papers dated January 20, 2006, while his appeal was still pending before the Appellate Division, Petitioner filed a second collateral motion to vacate his conviction, arguing that his trial counsel had provided him ineffective assistance under state and federal standards. (*See* Gill Decl., Ex. N (Memorandum of Law in Support of Motion to Set Aside Judgment Pu[r]suant to Criminal Procedure Law [Section] 440.10(1)(h), dated Jan. 20, 2006).)  According to Petitioner, trial counsel had failed to subpoena certain telephone records that would have substantiated Petitioner's claim that P.E. was a prostitute, and had failed to investigate the maintenance history of the elevator at the building where P.E. was allegedly attacked, which would have contradicted her testimony that the elevator went to the deserted ninth floor when she pressed the button for the seventh floor.  (*See id.*, at 8-9.)  Petitioner argued that, had his trial counsel obtained these telephone and elevator maintenance records, P.E.'s "claims of being kidnapped [sic] and raped would have come under serious scrutiny and there would have been more than a probability that [Petitioner] would have been acquitted of those charges." (*Id.*, at 10-11.)

On May 30, 2006, the trial court rejected Petitioner's second Section 440 motion, finding that Petitioner's trial counsel had rendered effective assistance of counsel under both state and federal standards.  (*See* Gill Decl., Ex. P (Decision and Order, dated May 30, 2006).)

17

Specifically, the court noted that, with respect to P.E., it was because of defense counsel's effective advocacy that the jury was unable to reach a verdict on the first-degree rape and first-degree sexual abuse counts, and that the court dismissed the second-degree assault charge.  (*See id.*, at 8-9.)  Moreover, while acknowledging that P.E.'s telephone records may have tended to support Petitioner's assertion that, contrary to her testimony, P.E. had worked as an escort (*see id.*, at 4),[11] the Appellate Division found that the trial record did not support, and in fact contradicted, Petitioner's claim that he had instructed his trial counsel to subpoena those telephone records (*see id.*, at 6-7).  The court concluded that, in any event, counsel's alleged failure to subpoena the telephone records would not have changed the jury's verdict, as the jury had ample evidence, including Petitioner's own testimony, from which to conclude that Petitioner had abducted P.E.  (*See id.*, at 7-8.)

On August 2, 2006, the Appellate Division summarily denied Petitioner's application for leave to appeal from the denial of his second Section 440 motion.  *People v. Cumberland*, No. M-3522, 2006 N.Y. App. Div. LEXIS 10439 (1st Dep't Aug. 24, 2006).  As noted above, the Appellate Division subsequently vacated all of Petitioner's kidnapping convictions, including the kidnapping conviction regarding P.E., when it resolved Petitioner's direct appeal.  *See Cumberland*, 822 N.Y.S.2d at 284.

### 5.   Petition for Writ of Error *Coram Nobis*

By papers dated July 28, 2007 (*see* Gill Decl., Ex. R (Memorandum of Law In Support of Motion for Writ of Error Coram Nobis, dated July 28, 2007)), Petitioner applied for a writ of

---

[11] These telephone records were apparently obtained by the defendant in a separate civil action brought by P.E. against the management of the building where she claimed to have been attacked by Petitioner.  (*See* Gill Decl., Ex. N, at 6.)

error *coram nobis*, arguing that his appellate counsel had rendered ineffective assistance by failing to argue:  (1) that, as to the charges related to H.C.S., insufficient evidence existed to sustain the guilty verdicts for third-degree robbery, first-degree rape, and first-degree sodomy (*see id.*, at 18-23); (2) that Petitioner's indictment in May, 2002, for crimes committed in April, 1997, violated the applicable state statute of limitations, that the available tolling of the limitations period should have been limited, under the supremacy clause, to the tolling available for analogous federal crimes, and that the "effects the passage of time" had on M.G.'s recollection of the attacks violated Petitioner's right to a fair trial (*see id.*, at 23-29); (3) that trial counsel's failure to object to the prosecution's improper reference to Petitioner's refusal to submit to a DNA test denied Petitioner his right to due process (*see id.*, at 30-32); and (4) that trial counsel's cross-examination of M.G. and investigation into M.G.'s background were deficient (*see id.*, at 32-35).

On December 20, 2007, the Appellate Division summarily rejected Petitioner's *coram nobis* petition, *People v. Cumberland*, 2007 WL 4442497, 2007 N.Y. Slip Op. 87109 (U) (NY) (1st Dep't Dec. 20, 2007), and, on February 29, 2008, the New York Court of Appeals denied Petitioner's application for leave to appeal, *People v. Cumberland*, 10 N.Y.3d 763 (2008).

### 6.    Petition for Writ of Habeas Corpus

By papers dated March 27, 2008, Petitioner applied for a federal writ of habeas corpus. (*See* Petition Under 28 USC § 2254 for Writ Habeas Corpus by a Person in State Custody, dated Mar. 27, 2008 (Dkt. 2).)  With leave of Court (*see* Dkt. 9), Petitioner subsequently filed an Amended Petition (*see* Am. Pet.).  The Amended Petition argues that Petitioner's conviction should be vacated because

(1)     the trial court conducted the state proceedings in a biased manner, thereby violating Petitioner's right to due process of law (*see* Am. Pet., App'x, at 12-15);

(2)     the prosecution engaged in misconduct, violating Petitioner's right to a fair trial, by (a) commenting on Petitioner's exercise of his constitutional right not to submit voluntarily to DNA testing (*see id.*, at 16-17), and (b) introducing the knife into evidence and asking improper questions about the knife (*id.*, at 17-19);

(3)     trial counsel was ineffective because he failed to subpoena witnesses with knowledge relevant to the incident involving M.G. and failed to cross examine M.G. effectively, and because counsel failed to preserve the Fourth-Amendment issue regarding Petitioner's alleged attempts to hide his DNA (*id.*, at 20-25);

(4)     appellate counsel was ineffective for failing to raise, on appeal, a claim of ineffective assistance of trial counsel, and for failing to argue that Petitioner's convictions regarding the attack on H.C.S. were against the weight of the evidence (*see id.*, at 25-27); and

(5)     Petitioner's indictments for the attack on M.G. violated the New York statute of limitations, as well as the federal statute which, Petitioner claims, preempts the state limitations period (*id.*, at 27-30).

## DISCUSSION

## I.     APPLICABLE LEGAL STANDARDS

### A.     Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via

certiorari" (citations omitted)).[12]  Under AEDPA, moreover, "[t]he time during which a properly

filed application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim is pending shall not be counted toward" the one-year limitation period

established by subsection 2244(d).  28 U.S.C. § 2244(d)(2).

    **B.**    **Exhaustion**

A federal court may not consider a petition for a writ of habeas corpus unless the

petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *see also*

*Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his

federal claims to the state courts, thereby affording those courts the "initial opportunity to pass

upon and correct alleged violations of [the] prisoners' federal rights."  *Picard*, 404 U.S. at 275

(internal quotation marks and citation omitted).  There are several ways by which a petitioner

can fairly present a federal claim to the state appellate court, including by citing federal cases or

citing the relevant provisions of the federal Constitution in his appellate brief.  *See Ramirez v.*

*Attorney Gen.*, 280 F.3d 87, 94-95 (2d Cir. 2001) (citing *Daye v. Attorney General*, 696 F.2d

186, 194 (2d Cir.1982)); *Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001).  Once the state

courts are appraised of the federal constitutional nature of a petitioner's claims, the exhaustion

requirement is fulfilled when those claims have been presented to "the highest court of the

---

[12] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (quotation marks and citation omitted).

### C.   Standard of Review

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362,

405-06 (2000).  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 409).

Under this "difficult to meet" standard, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  In order to be entitled to habeas relief, the petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.*, at 786-87.[13]

---

[13] The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 537 F.3d 102, 106-07 (2d Cir. 2008) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.").  Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief.  *Id.* (citing *Musladin*); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." (internal quotation marks omitted)).

## II.   **PETITIONER'S CLAIMS**

### A.   **The Amended Petition Was Timely Filed.**

As a threshold matter, this Court finds that Petitioner filed his federal habeas Petition, as well as his subsequent Amended Petition, within the statute of limitations provided by AEDPA. On February 2, 2007, the New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's affirmance of his conviction. *See Cumberland*, 8 N.Y.3d 879. Ninety days later, on May 2, 2007, Petitioner's conviction became final for purposes of the applicable limitations period. *See Williams*, 237 F.3d at 151. The limitations period then ran for 88 days until July 28, 2007, the date on which Petitioner filed his *coram nobis* petition. (*See* Gill Decl., Ex. R.) The limitations period was then tolled for 217 days during the pendency of the *coram nobis* petition, until the Court of Appeals, on February 29, 2008, denied Petitioner leave to appeal from the Appellate Division's denial of his *coram nobis* petition. *See Cumberland,* 10 N.Y.3d 763*; see also Nichols v. Brown*, No. 09 Civ. 6825 (NRB), 2013 WL 1703577, at *1 (S.D.N.Y. Apr. 19, 2013) (holding *coram nobis* petition was "pending" from time of filing until Court of Appeals denied leave, and therefore AEDPA's limitations period was tolled during entire period). At that point, Petitioner had 277 days remaining on AEDPA's one-year statute of limitations. Petitioner filed his original Petition on May 9, 2008, well within that remaining time. Similarly, he filed his Amended Petition within the limitations period, as he filed that pleading on October 27, 2008, 240 days after the pendency of his *coram nobis* petition ended. All of Petitioner's claims, therefore, have been asserted on a timely basis.

B.      **The Amended Petition Should Be Dismissed.**

Although timely filed, Petitioner's claims do not warrant relief, for the reasons discussed below.

1.      **Petitioner's Claims of Judicial Bias**

In his Amended Petition, Petitioner argues that the trial court violated his right to a fair trial by acting with bias against and expressing disdain for defense counsel, through the court's comments, facial expressions, and evidentiary rulings. (*See* Am. Pet., App'x, at 12-15.) In particular, the Amended Petition alleges that the trial court "exhibited a hostile regard towards the defense, which was truly unbridled with venom when the jury was absent . . . revealing the court's bitter dis[d]ain." (*Id.*, at 13.) Further, Petitioner claims that, as part of its bias against the defense, the trial court, through its evidentiary rulings, permitted the prosecution to engage in the same types of questioning and other trial conduct that, when it came to the defense, the court forbade. For example, according to the Amended Petition, the trial court permitted the prosecution to assume facts not in evidence over defense objections and to offer documents into evidence without proper authentication. (*See id.*, at 13.) Petitioner also claims that the trial court denied Petitioner the opportunity to call witnesses in his own defense. (*See id.*, at 15.)

Petitioner's claim of judicial misconduct is exhausted, because Petitioner asserted the same arguments on direct appeal, both to the Appellate Division (*see* Gill Decl., Ex. F, at 37-54) and in his letter seeking leave to appeal to the New York Court of Appeals (*see* Gill Decl., Ex. K, at 8).[14] The "last reasoned" state court decision on the issue, *see Ylst v. Nunnemaker*, 501

---

[14] Respondent, further, concedes that this claim is exhausted, and therefore waives any argument to the contrary. (*See* Resp. Mem., at 28 ("Petitioner has exhausted his claims of judicial and prosecutorial misconduct."); *Cornell v. Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011) (noting that court will treat claim as exhausted under AEDPA where respondent explicitly

U.S. 797, 803 (1991), was that of the Appellate Division, which rejected Petitioner's contention

of judicial bias on its merits, concluding that "[t]he [trial] court's conduct did not deprive

[Petitioner] of a fair trial," *Cumberland*, 822 N.Y.S.2d 284.  As the Appellate Division rejected

Petitioner's claim on its merits, this Court must apply AEDPA's deferential standard of review,

under which habeas relief is only appropriate if the state court decision "was contrary to, or

involved an unreasonable application of, clearly established [f]ederal law, as determined by the

Supreme Court of the United States" or "was based on an unreasonable determination of the

facts."  28 U.S.C. § 2254(d).

     The Supreme Court has held that "the Due Process clause clearly requires a fair trial in a

fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome

of his particular case."  *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (internal quotation

marks and citations omitted).  Nonetheless, in the context of the federal statute governing

judicial recusal,[15] the Supreme Court has explained that "judicial rulings alone almost never

constitute a valid basis" for finding bias, and that "judicial remarks that are critical or

disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a

bias or partiality challenge."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).   Indeed, the

Court held, in *Liteky*, that "expressions of impatience, dissatisfaction, annoyance, and even

anger, that are within the bounds of what imperfect men and women, even after having been

waives any exhaustion argument).)

    [15] Although that federal statute is inapplicable to claims that a state-court judge was
biased, the definition of "bias" relevant to the recusal statute is certainly not *less* stringent than
the constitutional "floor" for a "fair tribunal."  *See Bracy*, 520 U.S. at 904.

confirmed as . . . judges, sometimes display," do "*[n]ot* establish[] bias or partiality." *Id.*, at 555-56 (emphasis in original).

Here, the Appellate Division's determination that the trial court's actions did not rise to the level of a constitutional violation is not "contrary to or an unreasonable application of" these relevant Supreme Court precedents, nor was it based on an unreasonable assessment of the underlying facts.  *See* 28 U.S.C. § 2254(d).  Although, as Petitioner documents (*see* Gill Decl. Ex. F, at 37-54), the trial court was sometimes "critical or disapproving of, or even hostile to" defense counsel, *Liteky*, 510 U.S. at 555, the court also sometimes interrupted the prosecution in similar ways during the prosecutor's examination of witnesses (*see* Resp. Mem., at 38 (collecting examples)).  Overall, it would have been reasonable for the Appellate Division to assess the record as not demonstrating partiality by the trial court at a level sufficient to impair Petitioner's constitutional right to a fair trial.  Accordingly, under AEDPA, Petitioner's claims of judicial bias should be dismissed.

### 2. Petitioner's Claims of Prosecutorial Misconduct

#### a. Claim Regarding the Prosecutor's Comments About Obtaining DNA Evidence From Petitioner

As discussed above (*see supra,* at Background Section B(6)), Petitioner argues that the prosecution violated his 14th Amendment due-process rights by suggesting at trial that Petitioner's prior refusal to submit to a DNA test, and apparent intentional destruction of items such as cups and cigarette butts that might have provided DNA samples, showed consciousness of guilt.  (*See* Am. Pet., App'x, at 16-19.)  On direct appeal, however, the Appellate Division dismissed this claim, which was contained in Petitioner supplemental appellate briefing, as unpreserved.  *See Cumberland*, 822 N.Y.S.2d 284 (holding that "[t]he arguments contained in

defendant's pro se supplemental brief are unpreserved" and declining to "to review [those arguments] in the interest of justice").  The New York Court of Appeals subsequently denied Petitioner's request for leave to appeal.  *Cumberland*, 8 N.Y.3d 879.

Federal habeas review of a claim is not available where the same claim has been decided by a state court, and the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The state law ground may be substantive or procedural, *id.*, such as a failure to comply with a state preservation requirement.

In evaluating whether the state court has found a claim to be procedurally defaulted under state law, this Court must look to the last-reasoned state court opinion.  *See Ylst*, 501 U.S. at 803.  To determine that the state law ground on which the state court rested was "truly an *independent* basis for decision" rather than "merely a passing reference, . . . such reliance on state law must be clear from the face of the opinion."  *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (quoting *Coleman*, 501 U.S., at 732 (internal quotation marks omitted)); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, "the last state court to render judgment must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar'" (citation omitted; alterations in original)).  To be deemed *adequate*, the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *see Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

In this case, the last-reasoned state court decision is that of the Appellate Division, and it is clear from the face of that decision that the court rejected, as unpreserved, the prosecutorial-misconduct claim that Petitioner sought to raise in connection with the prosecution's reference to Petitioner's seeming attempts to avoid giving DNA evidence.  *See Cumberland*, 822 N.Y.S.2d at 285.[16]  Thus, lack of preservation constitutes an "independent" state-law procedural ground for the state courts' rejection of this claim.  *See, e.g.*, *Guity*, 2007 WL 3284694, at *7-8 (holding that "the Appellate Division's decision that [the] [p]etitioner's remaining contentions were 'unpreserved' [was] sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue" (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989))).

Further, New York's preservation rule, requiring that parties raise specific contemporaneous objections to a trial court's rulings before challenging them on appeal, *see* N.Y.C.P.L. § 470.05(2), affords an "adequate" basis for the Appellate Division's decision.  *See generally Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999); *Alvardo v. Burge*, No. 05 Civ. 1851 (AKH), 2006 WL 1840020, at *2 (S.D.N.Y. June 30, 2006).  New York courts have repeatedly held that, in the absence of objections during trial, a criminal defendant's due process and prosecutorial-misconduct claims will be unpreserved for appellate review, *see, e.g.*, *People v. Harris*, 98 N.Y.2d 452, 491 (1998); *People v. Hooper*, 732 N.Y.S.2d 207, 208 (4th Dep't 2001), *lv. denied* 97 N.Y.2d 755 (2002), and there is no basis for this Court to find that the state's preservation rule was inappropriately applied in this case, *see Cotto*, 331 F.3d at 240, as nothing

---

[16] The fact that the Appellate Division also held that, if it were to review these claims, it would reject them, *Cumberland*, 822 N.Y.S.2d 284, does not alter the fact that the claim is procedurally barred from habeas review, *see Guity v. Ercole*, 07 Civ. 0728 (RPP), 2007 WL 3284694, at *4, *7-8 (S.D.N.Y. Nov. 6, 2007).

in the record suggests that the prosecutorial-misconduct claims that Petitioner raises here were, in fact, presented at trial.

For these reasons, Petitioner's claim is procedurally barred from federal habeas review, *see, e.g.*, *Harripersaud v. Barkley*, No. 04-CV-4035 (NGG) (KAM), 2006 WL 467951, at *8 (E.D.N.Y. Feb. 27, 2006) (holding that due-process claim based upon alleged prosecutorial misconduct was procedurally barred where the Appellate Division had rejected that claim as unpreserved),[17] and this Court may only consider the claim if Petitioner is able to overcome the procedural bar.

Petitioner may overcome his procedural default by showing either (1) both cause for failing to raise his claim properly in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. In this instance, if his Petition is afforded a liberal construction, Petitioner arguably seeks to assert that the "cause" of his procedural default (*i.e.*, his failure to preserve his claim) was the ineffective assistance of his trial counsel. (*See* Am. Pet., App'x, at 25.) While ineffective assistance of trial counsel may constitute "cause" to overcome a procedural bar, *see Edwards v. Carpenter*, 529 U.S. 446, 451

_____

[17] Petitioner's suggestion (*see* Am. Pet., App'x, at 10-12) that his claim should be found to have been preserved (or be deemed preserved) because of the trial court's statement, in denying Petitioner's first Section 440 motion, that "each of the seven bases for which defendant seeks reversal are included within the trial record" (Gill Decl., Ex. C) misconstrues that ruling. The trial court did *not* hold that the trial record reflected that Petitioner had preserved objections to the prosecutor's challenged conduct, but rather that the challenged conduct *itself* was evident on the face of the record. Under the New York Criminal Procedure Law, this required the trial court to deny Petitioner's Section 440 motion. *See* N.Y.C.P.L. § 440.10(2)(b) (providing that a motion to vacate a conviction must be denied, if the judgment "is, at the time of the motion, appealable or pending on appeal, and sufficient *facts* appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal" (emphasis added)).

30

(2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488–489 (1986)), any such ineffective-assistance claim must itself have been exhausted in the state courts before it can be used to support a finding of "cause," *id.*, at 452-53 (holding that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted").  In this instance, Petitioner did not present this particular claim of trial counsel's ineffectiveness to the state courts, either on direct appeal or by way of a Section 440 motion, and this particular ineffective-assistance-of-counsel claim is thus itself procedurally barred.[18]  (*See* Discussion Section II(A)(3)(a), *infra*.)  Petitioner therefore cannot use trial counsel's alleged ineffective assistance to overcome the procedural bar to this Court's review of his claim.  As Petitioner cannot show cause for his procedural default, this Court need not reach the question of whether Petitioner can show prejudice.  *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.").

The Court may also excuse a procedural default where a petitioner "can demonstrate a sufficient probability that [the habeas court's] failure to review his federal claim will result in a fundamental miscarriage of justice."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman*, 501 U.S. at 750).  This exception, however, is quite narrow, as it is "concerned with actual as compared to legal innocence."  *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  Thus, to meet this standard, a petitioner must show that "a constitutional violation has probably resulted

---

[18] In his second Section 440 motion, Petitioner did claim that his trial counsel was ineffective, but for reasons entirely different than those he now raises.

in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327 (citations omitted).[19]  In this case, Petitioner has failed to show any probability that this Court's failure to review his claim would result in a fundamental miscarriage of justice, as he has offered no new evidence, scientific or otherwise, showing his actual innocence.

As Petitioner thus cannot overcome the procedural bar to this Court's review of his prosecutorial-misconduct claim, challenging the prosecutor's remarks regarding the collection of DNA evidence from Petitioner, the Court should dismiss that claim as procedurally barred.

> **b.      Claim Relating to the Prosecutor's
> Introduction of and Questioning About the Knife**

Petitioner further argues that the prosecution violated his 14th Amendment due-process rights by introducing, without laying a proper evidentiary foundation, the knife found by police in his brother's residence.  (*See* Am. Pet., App'x, at 17-18.)  According to the Amended Petition, "[t]here was no testimony of this knife as being either the same or similar to the knife allegedly used against two of the complainants."  (*Id.*, at 17.)  On direct appeal, the Appellate Division agreed that the prosecution, in cross-examining Petitioner about the knife, "should not have asked questions that assumed facts not yet in evidence," but found that "the error [did] not

---

[19] It is rare that a petitioner will be able to satisfy the actual innocence standard; indeed, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Schlup*, 513 U.S. at 324 (quotation marks and citation omitted).

warrant reversal in view of the court's instructions and the overwhelming evidence of defendant's guilt." *Cumberland*, 822 N.Y.S.2d at 285.[20]  As the Appellate Division rejected Petitioner's due-process claim regarding the knife on the merits, the AEDPA standard of review applies to this claim.

"The Supreme Court has held that prosecutorial misconduct violates due process when it is so prejudicial as to render the trial 'fundamentally unfair.'" *Herrera v. Senkowski*, 77 F. App'x 549, 551 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "To be entitled to relief, [a habeas petitioner] must show that he suffered actual prejudice because the prosecutor's [actions] had a substantial and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (internal quotations marks and citations omitted).   "To determine whether a prosecutor's [actions] caused" such "'substantial prejudice,'" the Court should consider "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements." *Moore v. Warden, Southport Correctional Facility*, 380 F. Supp. 2d 321, 330 (S.D.N.Y. 2005) (quoting *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990)).

In the situation presented here, the prosecutor's questioning regarding the knife and introduction of the knife into evidence, even if improper, cannot be said to rise to the level of a

---

[20] As the trial record does not reflect that the court gave the jury a particular limiting instruction as to how it could (or should not) consider the knife, the Appellate Division's reference to "the court's instructions" presumably referred to the court's more general instructions, and/or its instructions on the elements of the charged crimes.

constitutional violation, given that the prosecutor's actions do not appear to have prejudiced Petitioner at all, much less to have resulted in the type of significant prejudice necessary to render his trial "fundamentally unfair." *Donnelly*, 416 U.S. at 645. Specifically, while Petitioner was charged with first-degree robbery of both H.C.S. and P.E. (*i.e.*, robbery involving the use of a weapon), the jury *acquitted* him of those charges, convicting him only of third-degree robbery (which did not require a finding that a weapon was used). At a minimum, this strongly suggests that the jury was not unduly influenced by the introduction of and testimony regarding the knife. *See McKinnon v. Superintendent, Great Meadow Correctional Facility*, 422 F. App'x 69, 73 (2d Cir. 2011) (noting that the admission of a knife, even if error, did not result in a fundamentally unfair trial, where the defendant "was acquitted of the substantive weapons-possession charge for which that evidence was admitted"). Certainly, under AEDPA's standard of review, the Court cannot conclude that the Appellate Division unreasonably applied Supreme Court law when it found that Petitioner was not deprived of a constitutionally fair trial by the prosecutor's questioning of Petitioner about the knife.

Accordingly, this prosecutorial-misconduct claim should also be dismissed.

### 3. <u>Petitioner's Claim of Ineffective Assistance of Trial Counsel</u>

Petitioner, in his Amended Petition, contends that trial counsel was ineffective for failing to investigate certain facts, subpoena certain witnesses, and introduce certain testimony, all of which, Petitioner contends, would have called M.G.'s version of events into question. (*See* Am. Pet., App'x, at 20-23.) Petitioner also claims that he was deprived of the effective assistance of trial counsel when his counsel failed to "high-light" for the jury certain contradictions in M.G.'s testimony and between her testimony and that of others (*see id.*, at 23-24); and for abandoning any inquiry into remarks that M.G. supposedly made to Petitioner

34

that suggested that she had consented to sex (*see id.*, 24).  Petitioner also claims that trial counsel "was equally ineffective in his failing to preserve [Petitioner's] objection to the prosecution's use of his U.S. Fourth Amendment exercise [*i.e.*, his refusal to consent to giving a DNA sample] as evidence of guilt."  (*Id.*, at 25.)

Petitioner did not raise any of these claims on his direct appeal.  (*See* Gill Decl., Exs. F, G.)  Nor did he exhaust them through any other state-court proceedings.  Although Petitioner now suggests that he exhausted these claims through his first Section 440 motion (*see* Am. Pet., App'x, at 3-4), this suggestion is demonstrably incorrect.  That first Section 440 motion catalogued multiple examples of alleged prosecutorial misconduct and alleged errors by the trial court, including judicial rulings that prevented defense counsel from introducing certain evidence, but Petitioner never claimed that those alleged failures were attributable to his own counsel (*see* Gill Decl., Ex. A), and thus his motion cannot be said to have "fairly presented" his ineffective-assistance claims to the state court, *see Picard*, 404 U.S. at 275; *see also Rush v. Lempke*, 500 F. App'x 12, 14 (2d Cir. 2012) (noting that, for fair presentation, "the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court" (internal quotation marks and citation omitted)).[21]

While, in his second Section 440 motion, Petitioner did allege that he was deprived of the effective assistance of trial counsel, that motion was also insufficient to exhaust Petitioner's present claims.  In that motion, Petitioner challenged his counsel's alleged failure to subpoena

---

[21] Even if Petitioner were correct (which he is not) that he raised these claims on his first Section 440 motion, his claims would be procedurally barred because the state court denied that motion under N.Y.C.P.L. § 440.10(2)(b), which constitutes an independent and adequate state-law procedural ground for its decision, *see Avent v. Napoli*, No. 08 Civ. 932 (VB) (LMS), 2013 WL 1788626, at *10 (S.D.N.Y. Feb. 7, 2013), *report and recommendation adopted by* 2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013).

certain records, including telephone records, which, Petitioner asserted, would have corroborated

his testimony that P.E. was an escort and consented to sexual contact.  (*See* Gill Decl., Ex. N.)

Petitioner's vague assertion, on that motion, that the specific issues he was raising were "merely

intend[ed] . . . to reflect the totality of counsel's ineffectiveness in defending his client against

the claims rendered against him by the complainants" (Gill Decl., Ex. N (Memorandum of Law),

at 10) was plainly insufficient to apprise the state court of the nature of any other complaints he

may have had regarding his trial counsel's representation, *see Warren v. Goord*, No.

06–CV–1423 (RRM), 2013 WL 1310465, at *18-19 (E.D.N.Y. Mar. 28, 2013) (holding that

ineffective-assistance claim was not exhausted where claim "was fairly presented to the state

courts,  . . . but on different grounds than are now before the Court"); *Rowe v. New York*, No. 99

Civ. 12281 (GEL), 2002 WL 100633, at *2-3 (S.D.N.Y. Jan. 25, 2002) (upholding magistrate

judge's conclusion that while petitioner "did . . . raise a claim of ineffective assistance on his

direct appeal, his present ineffective assistance claim" was nevertheless unexhausted "because it

rests on a different set of facts than those presented to the state court").

Finally, although Petitioner raised his current ineffective-assistance-of-trial-counsel

claims in his *coram nobis* petition, he raised them there only indirectly, by arguing that his

appellate counsel was ineffective for failing to raise these claims on direct appeal.  Under New

York law, "the writ of error coram nobis lies in [the state appellate court] only to vacate an order

determining an appeal on the ground that the defendant was deprived of the effective assistance

of appellate counsel."  *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (internal quotation

marks and citations omitted).  Other alleged constitutional violations, including ineffective

assistance of trial counsel, may be raised in a *coram nobis* petition "only as predicates for the

claim of [appellate counsel's] ineffectiveness, on the theory that effective [appellate] counsel

would have appealed on those grounds," but such "predicate" claims are not themselves exhausted simply by being mentioned in a *coram nobis* petition. *Id.* Petitioner, therefore, has not exhausted his ineffective-assistance-of-trial-counsel claims.[22]

Nevertheless, because Petitioner's "claims are now procedurally barred from presentation to" the state courts,[23] those claims are "deemed" exhausted, for the purposes of federal habeas review. *See Grey v. Hoke*, 933 F.2d 117, 120–21 (2d Cir.1991). Yet, in circumstances where a claim is deemed exhausted because of a state procedural bar, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim." *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *see also Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir.2001). Petitioner's unexhausted claims are therefore procedurally

---

[22] In *Aparicio v. Artuz*, 269 F.3d 78, 92-93 (2d Cir. 2001), the Second Circuit held that, where the Appellate Division had summarily denied a *coram nobis* petition in which the petitioner had sought to challenge the effectiveness of both his trial and appellate counsel, the ineffective-assistance-of-trial-counsel claim should be found exhausted, but procedurally barred from habeas review, because it would fair to assume that the Appellate Division had rejected the claim on the independent, state-law procedural ground that it had been improperly raised in the *coram nobis* proceeding. Although it is not entirely clear whether the trial-counsel claim in *Aparicio* had actually been raised on *coram nobis* as an independent claim (as opposed to as a predicate for a claim challenging the effectiveness of appellate counsel), most courts have read *Aparicio* to apply to underlying claims raised on *coram nobis* either directly or indirectly. *See, e.g., Davis v. Greene*, No. 04–CV–6132, 2008 WL 216912, at *7-8 (S.D.N.Y. Jan. 22, 2008). Ultimately, though, it does not matter whether this court finds that Petitioner's ineffective-assistance-of-trial-counsel claim is exhausted, under *Arparicio*, or unexhausted but "deemed" exhausted, as set out above, as, in either event, the claim would be procedurally barred from review by this Court.

[23] Petitioner has already taken the single direct appeal to which he is entitled under New York law, *see* N.Y.C.P.L. § 450.10(1), and any collateral motion to vacate the judgment on the basis of his current ineffective-assistance claims would fail because the grounds were evident from the trial record and therefore should have been raised on direct appeal, *see* N.Y.C.P.L. § 440.10(2)(c).

barred from habeas review by this Court, *see Rodriguez v. Lee*, 10 Civ. 3451 (RMB) (JCF), 2011 WL 1362116 at *9-10 (S.D.N.Y. Feb. 22, 2011) (finding record-based claims raised indirectly in *coram nobis* petition, as predicates to claim of ineffective assistance of appellate counsel, were deemed exhausted and procedurally barred because they could no longer be raised in state courts), *report and recommendation adopted by* 2011 WL 1344599 (S.D.N.Y. Apr. 8, 2011), and cannot be reviewed unless Petitioner can overcome the procedural bar.  Once again, Petitioner can only do this by showing either (1) both cause for failing to raise the claim properly in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750, and he cannot make either showing.

Liberally construed, the Amended Petition, which also asserts that Petitioner was deprived of the effective assistance of appellate counsel (*see* Am. Pet, App'x, at 25), may be read to suggest that appellate counsel's failure to raise Petitioner's ineffective-assistance-of-trial-counsel claims constituted "cause" for Petitioner's procedural default of those claims.  For the reasons discussed below, however, Petitioner's challenge to the conduct of his appellate counsel is without merit (*see* Discussion *infra*, at Section II(B)(4)), and Petitioner cannot rely on a meritless claim as cause for his default, *see Zamudio-Berges v. U.S.*, No. 08 Civ. 8789 (RO) (REE), 2013 WL 2896978, at *13 (S.D.N.Y. June 13, 2013).  As Petitioner has advanced no other "cause" for his procedural default, the Court need not reach the question of whether he can show prejudice.  *See Stepney*, 760 F.2d at 45.  Further, for the same reasons discussed above, Petitioner cannot show that a "fundamental misarrange of justice" would result from this Court's failure to review his defaulted claims.

Under the circumstances, Petitioner has not demonstrated that he can overcome the

procedural bar to this Court's consideration of his ineffective-assistance-of-trial-counsel claims,

and I recommend that these claims be dismissed as procedurally defaulted.

4.     **Petitioner's Claim of Ineffective Assistance of Appellate Counsel**

Petitioner claims that appellate counsel rendered ineffective assistance by failing to

argue, on direct appeal, that Petitioner's convictions for third-degree robbery, first-degree rape,

and first-degree sodomy, as committed against H.C.S., were against the weight of the evidence

(*see* Am. Pet., App'x, at 25-27), and by failing to argue that trial counsel's assistance was

ineffective (*see id.*, at 25).  These ineffective-assistance-of-appellate-counsel claims are

exhausted, as Petitioner has previously raised them in his *coram nobis* petition before the

Appellate Division and sought leave to raise them before the New York Court of Appeals.  *See*

*Chu v. Artus*, No. 07 Civ. 6684 (RJS) (DF), 2011 WL 8202381, at *13 (S.D.N.Y.  Aug. 9, 2011)

(finding that "[p]etitioner has fully exhausted one of his claims regarding the adequacy of his

appellate counsel . . . by asserting that claim in a state *coram nobis* proceeding, and then seeking

leave to appeal to the Court of Appeals from the Appellate Division's denial of that claim"),

*report and recommendation adopted by*, 2012 WL 2899378 (S.D.N.Y. July 16, 2012).

The Appellate Division rejected Petitioner's *coram nobis* petition, and the Court of

Appeals affirmed that rejection, both without legal analysis.  *See Cumberland*, 2007 WL

4442497; *Cumberland*, 10 N.Y.3d 763.  As nothing in the state court decisions suggests that

Petitioner's claims were rejected on a procedural ground, this Court must apply AEDPA's

deferential standard of review to these claims.  *See Washington v. Brown*, No. 09 Civ. 544 (JG),

2009 WL 1605553, at *3 (E.D.N.Y. June 8, 2009) ("If a state court's summary disposition of a

petition does not expressly indicate that a claim was denied as procedurally barred, a federal

court must presume that the state court denied that claim on the merits." (citing *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006))).

For AEDPA purposes, *Strickland v. Washington*, 466 U.S. 668 (1984), sets out the "clearly established federal law" regarding a defendant's constitutional right to the effective assistance of appellate counsel.  *See, e.g., Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (habeas petitioner must establish that *Strickland* was applied unreasonably by state courts); *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland* to claim for ineffective assistance of appellate counsel); *Aparicio*, 269 F.3d at 95 (holding that "[t]he *Strickland* standard" is "the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States'" applicable to claims of ineffective assistance of appellate counsel (quoting 28 U.S.C. § 2254(d))).  To establish that appellate counsel was constitutionally "ineffective," Petitioner must show that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and, (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court.[24]  *See, e.g., Smith*, 528 U.S. at 285; *Aparicio*, 269 F.3d at 95.

A petitioner may demonstrate that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

---

[24] The Court may reject an ineffective-assistance-of-counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other.  *Strickland*, 466 U.S. at 697 (stating that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *see also Morales v. United States*, No. 98-3700, 1999 WL 1015641, at *1 (2d Cir. 1999) (finding it unnecessary to address "whether appellant's trial counsel was unreasonably deficient in his performance because any deficiency in this regard did not prejudice appellant").

Appellate counsel does not, however, have a duty to advance every available non-frivolous argument on appeal, because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, 754 (1983).

Further, under AEDPA, a petitioner "must do more than show that he would have satisfied *Strickland*'s test if his [ineffective-assistance] claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Rather, the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* In this case, Petitioner would have to show that the claims that he asserts appellate counsel should have raised were "significant and obvious," that the claims appellate counsel *did* choose to pursue "were clearly and significantly weaker," *Mayo*, 13 F.3d at 533, and that it was "objectively unreasonable" for the Appellate Division to reach a different conclusion, *Bell*, 535 U.S. at 689.

As discussed in greater detail below regarding each of the underlying claims that, according to Petitioner, his appellate counsel should have raised, Petitioner cannot meet this high standard here.

### a.      Failure To Argue That Petitioner's Conviction for Forcibly Raping H.C.S. Was Against the Weight of the Evidence

It was entirely reasonable for Petitioner's appellate counsel to have refrained from arguing, on direct appeal, that Petitioner's convictions for the incident involving H.C.S. were against the weight of the evidence (*see* Am. Pet., App'x, at 25-27), because that argument would

have been a weak one.  Under New York law, a challenge to the "weight" of the evidence requires a court not only to determine whether a "valid line of reasoning and permissible inferences" supports the jury verdict, but also to "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony."  *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987) (internal quotation marks and citations omitted).  In making this determination, "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony[,] and observe demeanor," and the court must be "careful not to substitute [itself] for the jury."  *Id.*

According to Petitioner, "[t]he *only* threat, either express or implied" to which H.C.S. testified, was "the presence of the knife," and, therefore, if the jury concluded that there was no knife (which would explain Petitioner's conviction for only third-degree, not first-degree robbery), the jury could not have concluded that H.C.S. was forcibly raped.  (Am. Pet., App'x, at 25-27 (emphasis added).)  Petitioner's characterization of the evidence is incorrect, however, as there was substantial other evidence in the trial record from which the jury could have concluded that Petitioner forcibly raped H.C.S.  First, the jury watched a video of Petitioner and H.C.S. in the elevator, and, based on the descriptions of that video in the record (*see* Trial Tr., at 1124:14-1127:21; 1077:12-1078:12), the jury may well have concluded from its viewing that, even if Petitioner was not obviously armed at the time of the robbery, he was still menacing or physically threatening H.C.S. in some other way (*see id.* (describing video as showing Petitioner with an object in his hand, pointing it towards H.C.S., and taking her bag, and leading H.C.S. off of elevator with one hand raised and one hand on her).  Second, the jury could have credited H.C.S.'s testimony that Petitioner threatened her with a knife during the *rape*, even if the jury did not believe there was enough evidence to conclude, beyond a reasonable doubt, that

42

Petitioner had used a knife to commit the *robbery* in the elevator.[25]  Third, and most importantly, H.C.S. testified that Petitioner, who was significantly larger than she, "grabbed" her wallet (Trial Tr. 271:22-23), and that, after she and Petitioner got off of the elevator, Petitioner "dragged" her up the stairs, "thr[e]w [her] down there," "tore" off her clothing, "grabbed" her despite her "shov[ing] him off," and then had sexual intercourse with her (*see* Trial Tr. 273:3-277:8).

Given the totality of H.C.S.'s testimony and the other evidence in the record, there is a "valid line of reasoning and permissible inferences," *Bleakley*, 29 N.Y.2d at 495, by which the jury could have concluded that Petitioner did not rob H.C.S. at knife-point in the elevator, but did forcibly rape her, either at knife-point or by dragging, pushing, and grabbing her, after leaving the elevator.  Further, even if H.C.S.'s testimony was less than fully credible, the third-party witnesses who observed her apparent physical and mental distress immediately after the incident (*see, e.g.*, Trial Tr. 502:1-5; 505:5-11; 512:2-19), corroborated her version of the core events at issue, rather than Petitioner's version.

For all of these reasons, it is unlikely that Petitioner would have prevailed on his "weight of the evidence" claim, had appellate counsel raised it on direct appeal.  At a minimum, this claim would not have presented "a significant and obvious issue[]" that was "clearly" stronger than the claims appellate counsel did raise.  *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.

---

[25] In this regard, it should be noted that the jury was not just entitled to credit H.C.S.'s testimony in part, but may have had particular reason to do so here.  Based on the transcript of her testimony, it appears that H.C.S., who testified through an interpreter, may have had some difficulty understanding the questions posed to her.  (*See, e.g.* Trial Tr. 348:5-25 (H.C.S. confirming, seemingly without meaning to do so, that, in her position as an escort, she had agreed to perform "a knife-point rape and robbery" on the date in question).)

1994).[26]  Accordingly, this Court cannot conclude that, in rejecting this particular claim of ineffective assistance of appellate counsel, the Appellate Division applied *Strickland* "in an objectively unreasonable manner," *Bell*, 535 U.S. at 698-99, and I recommend that this claim be dismissed, under AEDPA.

### b.      Failure To Argue That Trial Counsel Was Ineffective

Petitioner claims that his appellate counsel should have argued that Petitioner's trial counsel was ineffective for the reasons Petitioner sets out in his Amended Petition.  (*See* Discussion *supra*, at Section II(B)(3).)  Primarily, Petitioner argues that his appellate counsel should have challenged trial counsel's alleged deficiencies in defending Petitioner against the charges relating to M.G. (*see* Am. Pet., App'x, at 20-25), although Petitioner also argues that appellate counsel should have challenged trial counsel's failure to preserve a Fourth Amendment objection to the prosecutor's remarks regarding Petitioner's resistance to providing a DNA sample (*see* Am. Pet., App'x, at 25).

Under *Strickland*, in order for a criminal defendant to demonstrate that he was deprived of his right to the effective assistance of trial counsel, the defendant must show, first, that his counsel's performance fell below an "objective standard of reasonableness," measured under "prevailing professional norms."  466 U.S. at 688.  In determining whether counsel's performance was deficient, the court must accord substantial deference to counsel's strategic decisions and judgment.  *See id.* at 689 (holding that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").  Second,

---

[26] In this regard, the Court notes that one of the three arguments Petitioner's appellate counsel did raise was actually successful, resulting in dismissal of Petitioner's kidnapping convictions.

under *Strickland*, the defendant must affirmatively demonstrate prejudice by showing that "there is a reasonable probability that, but for counsel's [deficient performance], the result of the proceeding would have been different."  *Id.* at 694; *accord Hill*, 474 U.S. at 57-59.  In this regard, it is not enough that counsel's deficiency "had some conceivable effect on the outcome of the proceeding[,] [as] [v]irtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693 (citation omitted).  Rather, a "reasonable probability" that the result of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Here, Petitioner's appellate counsel was not unreasonable in concluding that Petitioner's ineffective-assistance-of-trial-counsel claims could not meet the "high bar" set out in *Strickland.  U.S. v. Serna*, 345 F. App'x 652, 654 (2d Cir. 2009).

Petitioner's major complaint regarding the performance of his trial counsel was that his counsel failed to make sufficient efforts to bring out certain inconsistencies in M.G.'s retelling of events to hospital staff, police detectives, and the grand jury, and at trial.  (*See* Am. Pet., App'x, at 20-25.)  Generally, however, a defense attorney's decisions to refrain from questioning a crime victim regarding inconsistencies in his or her statements have been found to fall within the "wide range" of acceptable professional conduct.  *See, e.g.*, *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (making such a finding with regard to trial counsel's cross-examination of victim of sexual assault).  This is because "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner,' are [considered] . . . strategic in nature.'"  *Id.* (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); alteration in original).

In this instance, the inconsistencies noted by Petitioner were not sufficiently significant for defense counsel's failure to highlight them for the jury to have rendered counsel's performance constitutionally deficient.  In fact, certain of the alleged discrepancies in M.G.'s account may not have been discrepancies at all.  For example, Petitioner points out that, at trial, M.G. testified that Petitioner instructed her to take off her pants and sneakers, while, in notes of an earlier interview by a police detective, she supposedly indicated only that she was told to take off her sneakers, and that she then proceeded to remove her sneakers and also her pants. (Am. Pet., App'x, at 23.)  Petitioner has not provided a copy of the police interview notes to this Court, but, even accepting Petitioner's description of their contents, the jury could have fairly inferred from M.G.'s recounted statement, considered in the context of the rest of her testimony, that she intended to convey that Petitioner had instructed her to remove both items of clothing.

As another example, Petitioner asserts that, in this same police interview, not placed before the jury, M.G. reported that Petitioner had told her to "shut up and stop screaming and he won't hurt her," whereas, at trial, M.G. testified that Petitioner had told her "something like shut the fuck up bitch or I'll kill you."  (*See id.*; *see also* Trial Tr., at 602:5-6.)  Not only would either of these statements have been physically threatening, but, in this instance, M.G.'s trial testimony was virtually identical to her grand jury testimony – a point Petitioner fails to mention, even as he argues that the grand jury testimony should have been introduced by his counsel for other impeachment purposes.  (*See* Am. Pet., App'x, at 23.)  Moreover, even according to Petitioner, the same police interview notes supposedly included a notation that M.G. was afraid that Petitioner would kill her (*see id.*, at 33), and, similarly, on the date of the incident itself, M.G. reportedly told police that she "did as he said because she thought he was going to kill her" (*id.*,

46

at 32).  Thus, throughout her various accounts to the police, M.G. apparently consistently tried to convey that she had feared for her life.[27]

At trial, M.G. also qualified aspects of her testimony, by testifying that Petitioner "said something like" what she then recounted, or that she was "not sure" about certain details.  (*See* Am. Pet., App'x, at 23 (quoting, for example, M.G.'s testimony as, "I'm not sure, but I don't think I got in the elevator with him again, I think I walked down the stairs").)  Under all of these circumstances, and given that each of M.G.'s recitations of events essentially reiterated that Petitioner had threatened her and engaged in violent conduct, trial counsel's decision not to bring each of those several accounts separately to light (which may have only served to make M.G. more sympathetic and to reinforce the incriminating nature of her testimony) must be viewed as a reasonable strategic decision.  Indeed, when defense counsel did bring out, at trial, a key inconsistency in M.G.'s statements – the fact that she had initially told hospital staff and the police that her rapist had physically forced her into the building where the rape occurred, but then later admitted that she voluntarily accompanied him (Trial Tr. 631:9-634:13) – M.G. used the opportunity to explain that she "was completely exhausted and worn out" (*id.* 632:20-21) and

---

[27] This fear can also be reasonably inferred from M.G.'s account of events, as recorded in an undated police memo book.  In that account, M.G. purportedly stated that Petitioner had grabbed her from behind, after which she pleaded, "don't hurt me . . . you know how to make love."  (Am. Pet., App'x, at 33-34.)  Further, according to the same entry, she reportedly told police that she "screamed the whole time" and that Petitioner grabbed her throat.  (*See id.*)  Although Petitioner argues that his trial counsel should have introduced M.G.'s statement "you know how to make love" as evidence of M.G.'s "consent" to sex (*see* Am. Pet., App'x, at 24), the full statement suggests a lack of consent, consistent with M.G.'s testimony at trial that she did not actively resist the rape, so as to avoid additional physical harm (*see* Trial Tr., at 603:2-15 (M.G. testifying that she stopped screaming and cooperated with Petitioner so that he would stop gagging her and not kill her)).

"very ashamed" (*id.* 633:20).  Under the circumstances, counsel may well have wished to avoid giving M.G. even more opportunities to expand on the emotional impact of the alleged rape.

For similar reasons, Petitioner also cannot show that his trial counsel was ineffective for failing to subpoena the police witnesses who would have been needed to introduce the various police reports that contained M.G.'s prior versions of events.  (*See* Am. Pet., App'x, at 24-25.) Even if counsel's failure resulted in these reports being excluded from evidence, Petitioner has not, as discussed above, demonstrated that these reports – even if, in some respects, inconsistent with M.G.'s trial testimony –  would have materially helped his case; on the contrary, their inclusion in the record may have worked to Petitioner's disadvantage.  The testimony of the additional police witnesses may also have been detrimental to Petitioner's defense, given that they may well have recounted observations regarding M.G.'s physical and mental state, after the incident, that would have corroborated her fundamental account of being raped.  *Cf. Tucker v. U.S.*, Nos. 11 Civ. 6469 (SAS), S5 05 CR 711 (SAS), 2012 WL 4354806, at *8 (S.D.N.Y. Sept. 24, 2012) (holding that counsel was not ineffective for failing to call witness who allegedly would have given exculpatory testimony when, in reality, the witness's testimony would have harmed defendant).

Petitioner's further contention that his trial counsel failed to conduct an adequate pre-trial investigation, so as to uncover other witnesses and evidence to impeach M.G.'s credibility, is also insufficient to support an ineffective-assistance claim.  In this regard, Petitioner has made no showing that the types of inquiry in which he claims his counsel should have engaged (to determine, for example, "how long . . . [M.G.] walk[ed] around . . . before heading back to her therapist's office" and "the nature of [M.G.]'s therapy" (*see* Am. Pet., App'x, at 22-23))

would have led to admissible evidence that, if then introduced, would have likely altered the outcome of the trial.

In any event, all of Petitioner's arguments regarding his trial counsel's insufficient efforts to impeach M.G.'s credibility are undercut by the trial record, which shows that, largely through counsel's cross-examination, the jury was made aware that M.G. had changed her account of relevant events in at least the significant respect noted above – *i.e.*, with regard to whether she had entered the building with Petitioner voluntarily or involuntarily.  (*See* Trial Tr. 631:9-634:13.)  Under *Strickland*, the performance of Petitioner's trial counsel should not be found to have been constitutionally deficient where, even if he did not use every possible avenue to impeach M.G.'s credibility, he nonetheless conducted a cross-examination that brought out an important discrepancy.  Further, in light of this, there was no "reasonable probability" that, had Petitioner's trial counsel introduced additional impeachment evidence, the outcome of the trial would have been different.  *See, e.g., Burgess v. Conway*, No. 09 Civ. 9151 (BSJ) (THK), 2010 WL 6841526 (S.D.N.Y. Oct. 21, 2010) (upholding under AEDPA, as not contrary to or an unreasonable application of *Strickland*, the state court's determination that "trial counsel's decision to focus on other, more significant inconsistencies in [an eyewitness's] testimony was not unreasonable"), *report and recommendation adopted by* 2011 WL 2638141 (S.D.N.Y. July 5, 2011); *Hightower v. U.S.*, Nos. 11 Civ. 8000 (JSR) (JCF), 07 Cr. 1111 (JSR), 2013 WL 3388957, at *4 (S.D.N.Y. July 8, 2013) (noting that, "even if his counsel had failed to obtain the grand jury testimony or failed to use it to impeach the trial testimony of [certain witnesses], [the defendant] could not demonstrate ineffective assistance" because import of such impeachment was established in other ways).

Finally, Petitioner has no stronger ineffective-assistance claim based on his trial counsel's failure to raise, and thereby preserve, Petitioner's "objection to the prosecution's use of [Petitioner's] Fourth Amendment exercise as evidence of guilt." (Am. Pet., App'x, at 25.) Petitioner has set forth no law in support of his position that the prosecutor's conduct in this regard, either in eliciting testimony or in making remarks to the jury in summation, was actually unconstitutional, and it is unclear that it was. As of the date of Petitioner's trial, the Supreme Court had made no pronouncement as to whether the Fourth Amendment afforded arrestees the right to decline a buccal swab, and the Court's recent decision on this subject, *Maryland v. King*, 133 S. Ct. 1958 (2013), held that no such right exists, at least for those arrested for "serious" crimes, *id.*, at 1979. Although Petitioner was initially arrested only for violating sex-offender registration requirements, his trial attorney's failure, in 2004, to press a Fourth-Amendment claim did not fall below reasonable standards of practice, given the state of the law at that time. Moreover, the actions by Petitioner to which the prosecutor drew particular attention, in this case, related not so much to Petitioner's refusal to permit a DNA swab, as to his attempts to destroy evidence that he had touched, and that might therefore have contained his DNA. (*See* Trial Tr., at 1106:8-1108:15.) It is difficult to see how introducing testimony regarding Petitioner's destruction of evidence could have violated his constitutional rights. In any event, there is no "reasonable probability" that the exclusion of the challenged testimony would have changed the outcome of Petitioner's trial, *Strickland*, 466 U.S. at 694, given the overwhelming evidence against him, including legally-obtained DNA that tied Petitioner to each crime,

Petitioner's admission that he had had sex with the victims, and the testimony of the victims themselves.[28]

Given the weakness of Petitioner's ineffective-assistance-of-trial-counsel claims, there is no basis for this Court to conclude that, had his appellate counsel raised those claims on appeal, they would have been successful.  At a minimum, Petitioner's arguments regarding his trial counsel's ineffectiveness were not so "significant and obvious," *Mayo*, 13 F.3d at 533, that it was unreasonable for Petitioner's appellate counsel  to "winnow[]" them out, *Jones*, 463 U.S. at 751, and focus instead on the three claims that appellate counsel did choose to present on direct appeal.  Certainly, under AEDPA's deferential standard of review, this Court cannot conclude that the Appellate Division unreasonably applied *Strickland* when it rejected Petitioner's claim that his appellate counsel rendered ineffective assistance for failing to challenge the performance of Petitioner's trial counsel.[29]

### 5.    Statute of Limitations Issue

For his last habeas claim, Petitioner asks the Court to "utlize it[]s power to consider novel isssues" and determine the constitutionality of Petitioner's indictment for crimes against

---

[28] Indeed, the prosecutor herself told the jury, in summation, that her argument regarding Petitioner's attempts to hide his DNA "[wa]sn't a huge point."  (Trial Tr., at 1108:11.)

[29] Additionally, the Court notes that Petitioner did present, in his *pro se* supplemental brief on direct appeal, several arguments that he believed his appellate counsel wrongfully omitted.  Petitioner does not explain why he did not also raise the arguments he now claims his appellate counsel should have added, but the circumstances suggest that counsel's omission alone did not prejudice Petitioner, as he had an opportunity to raise any additional claims *pro se*, and has, in fact, shown himself to be quite capable of cogently arguing his points without assistance of counsel.  *See U.S. v. Miller*, Nos. 92 CR 91 (RJD), 99–CV–3346 (RJD), 2010 WL 1269796, at *24 n.10 (E.D.N.Y. Mar. 30, 2010) (noting that, where petitioner had filed a *pro se* appellate brief in state court raising 17 issues, petitioner's own omission of a claim he later argued appellate counsel was ineffective for omitting "militates against finding 'cause' for, or otherwise excusing, the [petitioner's] procedural default" regarding that claim).

M.G. more than five years after those crimes occurred.  (*See* Am. Pet., App'x, at 27-30.)  It is unclear whether Petitioner is raising this claim as a predicate for his claim of ineffective assistance of appellate counsel (*i.e.*, claiming that appellate counsel should have raised the statute-of-limitations issue) or raising the statute-of-limitations issue as a freestanding claim.  As Petitioner's *pro se* papers should be construed liberally in his favor, this Court will consider the claim from both possible perspectives.

a.      **Appellate Counsel's Failure To Raise
a Statute-of-Limitations Defense**

Petitioner has exhausted the claim that his appellate counsel should have raised the statute-of-limitations issue on direct appeal, as Petitioner raised this claim in his *coram nobis* petition.  (*See* Gill Decl., Ex. R, at 2.)  As discussed above (*see* Discussion *supra*, at Section II(B)(4)), the Appellate Division denied Petitioner's *coram nobis* petition without analysis and, therefore, the court must be presumed to have rejected Petitioner's claim on the merits.  Accordingly, AEDPA's deferential standard of review applies.

Petitioner appears to concede that New York's five-year statute of limitations includes a provision allowing the statute of limitations to be tolled for up to five years if a criminal's identity is unknown, or whereabouts unascertainable.  (*See* Am. Pet., App'x, at 28; N.Y.C.P.L. § 30.10(4)(a).[30])  Petitioner contends, though, that permitting the limitations period to be tolled for the prosecution of individuals like him who did not purposefully evade capture, defeats the

---

[30] The current version of N.Y.C.P.L. § 30.10(1)(a) provides that a prosecution for first-degree rape or sodomy "may be commenced at any time," but at the time of Petitioner's indictment that subsection did not apply to the crimes with which he was charged.  *See Ramos v. Racette*, No. 11–CV–1412 (JG), 2012 WL 12924, at *10 n.13 (E.D.N.Y. Jan. 4, 2012) (explaining history of statute and holding 5-year statute and tolling provisions applicable to rape charge).

purpose of the statute of limitations and subjects such individuals to "extreme prejudice." (Am. Pet., App'x, at 29.)  Petitioner further argues that the tolling provision is incompatible with the federal statute of limitations applicable to similar crimes, and that the state tolling provision is therefore "preempted . . . pursuant to the United States Supremacy Clause."  (Am. Pet., App'x, at 30.)

The New York appellate courts, however, have routinely upheld New York's statute of limitations, including its tolling provision, in cases similar to Petitioner's.  *See, e.g.*, *People v. Ramos*, 61 A.D.3d 783,783, 877 N.Y.S.2d 177, 178 (2d Dep't 2009) (holding statute of limitations not violated in sexual assault case where indictment was filed nearly 10 years after crime because "the defendant's whereabouts were continuously unknown and continuously unascertainable by the exercise of reasonable diligence until his DNA profile from a sexual assault evidence kit was matched to DNA evidence taken from him pursuant to a subsequent incarceration").  Any argument that the tolling provision was inapplicable to Petitioner was thus almost sure to fail, and Petitioner's appellate counsel cannot be said to have provided ineffective assistance to Petitioner, by not raising it in this case.

Petitioner's appellate counsel was, likewise, not ineffective for failing to raise a constitutional challenge to the statute of limitations as applied in Petitioner's case.  "[F]ederal courts have universally found" that even a misapplication of a state statute of limitations raises only an issue of state law, not an issue of constitutional magnitude.  *Ramos v. Racette*, 2012 WL 12924, at *11-12 (collecting cases).  Petitioner's claim that the state statute of limitations is preempted by the federal statute of limitations for similar offenses, and therefore unconstitutional pursuant to the supremacy clause, is likewise meritless.  While "[i]t is accepted that Congress has the authority, in exercising its [U.S. Constitution] Article I powers, to

53

pre-empt state law," *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989), such

preemption occurs in three circumstances:  when Congress explicitly states that a federal law

preempts state law, "when Congress intends that federal law occupy a given field," or when

"compliance with both state and federal law is impossible," *id.*, at 100-01.  Petitioner has given

the Court no reason to believe that any of these three conditions are met here, and certainly has

not overcome the "presumption against finding pre-emption of state law in areas traditionally

regulated by the States," *id.*, at 101, such as criminal law, *see U.S. v. Morrison*, 529 U.S. 598,

618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders

denied the National Government and reposed in the States, than the suppression of violent crime

and vindication of its victims.").

As neither state law nor the federal Constitution was violated by Petitioner's indictment

for crimes against M.G. slightly more than five years after those crimes occurred, Petitioner's

appellate counsel cannot be found to have been ineffective for failing to raise a statute-of-

limitations claim on appeal.  For the same reasons, upon AEDPA review, there is no basis for

this Court to find that the Appellate Division, on *coram nobis*, unreasonably applied federal law

in rejecting this portion of Petitioner's ineffective-assistance-of-appellate-counsel claim.

   **b.**  **<u>Statute-of-Limitations Defense as a Freestanding Claim</u>**

Petitioner also may be presenting his statute-of-limitations defense as a new, freestanding

claim in his habeas petition.  Any such claim is unexhausted, however, given that Petitioner

never presented the statute-of-limitations issue to the state courts as a stand-alone claim.  *See*

*Turner*, 262 F.3d at 123 (holding that, when petitioner raises claims before state courts as

predicates to ineffective-assistance-of-counsel claim in *corram nobis* petition, underlying claims

are not exhausted).  As Petitioner can no longer raise this claim in the state courts, the claim

54

should be deemed exhausted, but procedurally barred (*see* Discussion *supra*, at Section II(B)(3)(b)), and, as Petitioner has shown no basis for overcoming this bar, the claim should be dismissed as procedurally defaulted.  In any event, for the reasons discussed in the previous section, Petitioner's statute-of-limitations claim is without merit.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Petitioner's Amended Petition for a writ of habeas corpus be DISMISSED in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Loretta A. Preska, United States Courthouse, 500 Pearl Street, Room 2200, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Preska.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw, he may request copies from Respondents' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities cited therein that are unpublished or reported exclusively on computerized databases] as are cited in a decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
        August 5, 2013

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Loretta A. Preska, U.S.D.J.

Mr. Robert Cumberland
DIN #04-A-1829
Green Haven Correctional Facility
P.O. Box 4000
594 State Route 216
Stormville, NY 12582

Respondent's counsel (via ECF)